388 So.2d 518 (1980)
GULF OIL CORPORATION, a corp.
v.
SPRIGGS ENTERPRISES, INC., a corp.
DIAMONDHEAD CORPORATION et al.
v.
SPRIGGS ENTERPRISES, INC., an Alabama corp.
78-863, 78-864.
Supreme Court of Alabama.
September 19, 1980.
*519 Wesley Pipes of Lyons, Pipes & Cook, Mobile, Douglas Arant and Samuel H. Franklin of Bradley, Arant, Rose & White, Birmingham, and Taylor D. Wilkins of Wilkins & Bankester, Bay Minette, for appellant Gulf Oil Corp.
Broox G. Holmes and James J. Ward, Jr., of Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Mobile, Norborne C. Stone, Jr. of Stone & Partin, Bay Minette, for appellants Diamondhead Corp. and Lake Forest, Inc.
E. E. Ball of Owen & Ball, Bay Minette, for appellees.
PER CURIAM.
On June 21, 1972, Lake Forest, Inc., a real estate developer which is a wholly-owned subsidiary of Diamondhead Corporation, sold some real property along U.S. Highway 98 just off I-10 in Baldwin County to Dixon Shell Service Station, Inc. (That corporation later became Spriggs Enterprises, Inc.) During the negotiations prior to the sale, Spriggs and Dixon, the initial partners in this enterprise, obtained a commitment in a personal letter[1] from Ralph Prince, who was at that time national sales manager for Diamondhead, that Diamondhead would not sell any of its property north of and between the Spriggs property and I-10 for the purpose of "an automotive service station," making the Spriggs station the first station off I-10. Spriggs recorded this letter in the office of the Judge of Probate in Baldwin County. In November, 1972, Spriggs opened its service station, supplied with Shell products by Mothershed Oil Co., Inc.
In November, 1976, Diamondhead began negotiations to sell the property between Spriggs' Shell station and I-10 to Gulf Oil. Although Diamondhead and Lake Forest contended at trial that the Prince letter had no binding effect, the deed executed by Lake Forest to Gulf in December, 1976, specifically stated that the purchaser agreed and it became a covenant running with the property that the land sold would be used solely for the construction of "one convenience store with no more than two islands for self-service gasoline pumps." This deed was also recorded. The property was cleared but the Gulf station has not yet been built.
On January 27, 1977, Spriggs and Mothershed sued Gulf, Lake Forest, and Diamondhead, seeking declaratory and injunctive relief with regard to the conveyance to Gulf and compensatory and punitive damages for alleged fraud, breach of contract, tortious interference with Spriggs' business *520 or with his contract with Lake Forest, and a civil conspiracy to interfere with Spriggs' business. In addition to damages, the plaintiff also asked the court to set aside the deed from Lake Forest to Gulf and to specifically enforce the Prince letter. It asked the court to permanently enjoin Lake Forest from conveying the property for the purpose of erecting a service station. Gulf answered and also requested a declaratory judgment on the respective rights of Spriggs and Gulf as to the Gulf property. Mothershed was dismissed as a party prior to the end of the trial.
At the close of the evidence, the trial court made the following statement to the jury and made it a part of the record:
The Court finds as a matter of law that the deed to Gulf Oil Corporation may not be set aside in this action.
The Court further finds as a matter of law that the Defendant, Gulf Oil Corporation had notice of the declaration contained in the Plaintiff's Exhibit No. 4 [the Prince letter] and is bound by the agreement, if any there is between Spriggs Company and Lake Forest and Diamondhead; and under the petition of Defendant Gulf the Court construes the deed to Defendant Gulf Oil Company to be a deed under and subject to the declaration in Plaintiff's Exhibit No. 4 [the Prince letter]. It is therefore ORDERED, ADJUDGED and DECREED that Defendant Gulf Oil Corporation be and it hereby is allowed to construct one convenience store with not more than two self service fuel pump islands; It is further ORDERED, ADJUDGED and DECREED that Defendant Gulf Oil Corporation be and it hereby is enjoined and restrained against selling monthly POL products and TBA items in a gross dollar volume greater than the gross dollar volume sales of convenience store sales. It is further ORDERED, ADJUDGED and DECREED that Defendant Gulf Oil be and it is further enjoined and restrained from displaying signs fairly inviting attention to the sales of POL products and TBA items greater than to convenience store sales item.
This injunction is to be placed of record and will run with the land.
The jury then returned two general verdicts against Gulf, Diamondhead, and Lake Forest. Two hundred fifty thousand dollars in actual damages and $1,000,000 in punitive damages were awarded to Spriggs. Defendants Gulf, Lake Forest, and Diamondhead filed motions for new trial and, in the alternative, for judgment notwithstanding the verdict, which were not acted on by the trial court and were thus deemed denied pursuant to ARCP 59.1. Gulf, Lake Forest, and Diamondhead appealed. We reverse and remand.
The trial court's conclusion of law and the order entered thereon are patently inconsistent with the jury verdicts. The order is also inconsistent in its terms. If it purports to grant specific performance of the Prince agreement, allowing Gulf to pump gas on the premises seems to conflict with it. Additionally, there is no evidence to support the injunction against selling "POL products and TBA items in a gross dollar volume greater than the gross dollar volume sales of convenience store sales."
But more basically, one cannot have a decree for specific performance and damages for breach of the same contract. Nor may the court award damages for the tort of fraud and misrepresentation and, at the same time, grant specific performance of the agreement. The theories of recovery are inconsistent, both legally and factually, and, therefore, the court's decree and the jury's verdict cannot coexist. U.S. Fidelity & Guaranty Co. v. McKinnon, 356 So.2d 600 (Ala. 1978).
A party defrauded in a contractual setting is afforded a number of remedies in our system, and may pursue several in the same action. However, he cannot have multiple redresses. At 37 Am.Jur.2d Fraud and Deceit § 327 (1968), this rule is stated as follows:
In pursuance of the rule that a contract or transaction induced by fraud is ordinarily merely voidable, a defrauded party *521 is, upon discovery of the fraud, put to an election. The legal system offers him a choice of several courses of conduct and remedies to redress the effect of the fraud and false representations. He may elect whether to proceed ex contractu or ex delicto.
And at 25 Am.Jur.2d Election of Remedies § 26 (1966):
As a general rule, the doctrine of election is fully applicable where one of the two actions involved is at law and the other is in equity.
Spriggs is not entitled to have the Prince agreement specifically enforced and, at the same time, recover damages for fraud. Although the trial court seems to have ordered specific performance in a modified form, this too is inconsistent with the jury verdicts either based on tort or on breach of contract.
We do not mean to suggest to Spriggs which of the remedies available it must elect. We hold only that it cannot have both the relief granted by the trial court and the jury verdict as well.
On retrial, the plaintiff must make an election at the latest before the case goes to the jury as to which of its inconsistent theories it elects to proceed on.
Because the trial court's conclusion of law and its order are inconsistent with the jury verdicts, the judgment denying the motions for new trial are reversed, and the cause is remanded for a new trial.
REVERSED AND REMANDED.
MADDOX, JONES, ALMON, SHORES, EMBRY and BEATTY, JJ., concur.
TORBERT, C. J., and FAULKNER, J., concur in the result.
FAULKNER, Justice (concurring in the result to reverse and remand).
These appeals are from a judgment for Spriggs Enterprises, Inc., in an action involving fraud, civil conspiracy, interference with business or contractual relations, and breach of contract claims.
On June 21, 1972, Lake Forest, Inc., a real estate developer which is a wholly-owned subsidiary of Diamondhead Corporation, sold some real property along U.S. 98 just off I-10 to Dixon Shell Service Station, Inc. (That corporation later became Spriggs Enterprises, Inc.) During the negotiations prior to the sale Spriggs and Dixon, the initial partners in this enterprise, obtained a commitment in a personal letter from Ralph Prince, who was at that time national sales manager for Diamondhead, that Diamondhead would not sell any of its property north of or between the Spriggs property and I-10 for the purpose of "an automotive service station," making the Spriggs station the first station off of I-10. Spriggs recorded this letter in the office of the Judge of Probate in Baldwin County. In November, 1972, Spriggs opened its service station supplied with Shell products by Mothershed Oil Co., Inc.
In November, 1976, Diamondhead began negotiations to sell the property between Spriggs' Shell station and I-10 to Gulf Oil. Even though Diamondhead and Lake Forest felt that the Prince letter had no binding effect, the deed executed by Lake Forest to Gulf in December, 1976, specifically stated that the purchaser agreed and it became a covenant running with the property that the land sold would be used solely for the construction of "one convenience store with no more than two islands for self-service gasoline pumps." This deed was also recorded. The property was cleared but the Gulf station has never been built.
On January 27, 1977, Spriggs, Inc. and Mothershed sued Gulf, Lake Forest, and Diamondhead, seeking declaratory and injunctive relief with regard to the conveyance to Gulf and compensatory and punitive damages for alleged fraud, breach of contract, tortious interference with Spriggs' business or with its contract with Lake Forest, and a civil conspiracy to interfere with Spriggs' business. Gulf answered and also requested a declaratory judgment on the respective rights of Spriggs and Gulf as to the Gulf property. Mothershed was dismissed as a party prior to the end of the *522 trial. The case was tried to a jury, which entered two general verdicts against Gulf, Diamondhead, and Lake Forest. Two Hundred Fifty Thousand Dollars in actual damages and One Million Dollars in punitive damages were awarded to Spriggs. Defendants Gulf, Lake Forest, and Diamondhead filed motions for new trial and, in the alternative, for judgment notwithstanding the verdict, which were not acted on by the trial court and thus were deemed denied pursuant to ARCP 59.1. Gulf, Lake Forest, and Diamondhead appeal.
The following issues are presented in these appeals by the appellants, notwithstanding the majority's opinion. It is my position to answer them.
(1) Did the trial court err in submitting Spriggs' claim for compensatory and punitive damages on the various counts to the jury?
(2) Was there error in the charges to the jury?
(3) Did the trial court err in concluding that the Prince letter created an enforceable restriction on Lake Forest's right to sell property to Gulf?
(4) Did the trial court err in refusing to grant the motions for new trial where the jury awards are so excessive as to have been the obvious result of passion, bias, or prejudice on the part of the jurors?
To recover for fraud, where the alleged fraud is premised on statements related to future events (here, that no other "automotive service station" would be built between Spriggs and I-10) it must be disclosed by the evidence that the promisor, at the time of the making of the promise of future action or abstention, had no intention of carrying out the promise. Smith v. Chase Manhattan Corp., 458 F.Supp. 470 (M.D.Ala. 1978) (applying Alabama law). If this is not established by the evidence, the fraud claim should not be submitted to the jury. A mere failure to perform does not without more, constitute evidence of a present intent not to perform. Old Southern Life Insurance Co. v. Woodall, 295 Ala. 235, 326 So.2d 726 (1976). My review of the record discloses no evidence that, at the time of the conveyance to Spriggs in 1972, Lake Forest and Diamondhead did not intend to perform the promise alleged to bind them. There were no pending negotiations for sale of the property in question for an automotive service station on or prior to June 21, 1972; no attempt to procure such a purchaser; and no statements evidencing an intent not to perform at that time.
Another element required to be proven in a fraud claim is actual damage resulting from the alleged fraudulent act. Amason v. First State Bank of Lineville, 369 So.2d 547 (Ala.1979); Pihakis v. Cottrell, 286 Ala. 579, 243 So.2d 685 (1971); Mobile Building & Loan Association v. Odom, 232 Ala. 19, 166 So. 698 (1936). An actual loss must also be shown to recover an award of damages for civil conspiracy and for breach for contract. Louisville & N.R. Co. v. National Park Bank, 188 Ala. 109, 65 So. 1003 (1914) (conspiracy), and Rickenbaugh v. Asbury, 28 Ala.App. 375, 185 So. 181, cert. denied 237 Ala. 7, 185 So. 187 (1938). Spriggs' claim against Gulf based on tortious interference with its business or with the contract alleged to exist between Spriggs and Lake Forest/Diamondhead by way of the Prince letter required as an essential element of the claim that some actual injury or damage to Spriggs' business to be proven to the trier of fact. See, Thompson v. Allstate Insurance Company, 476 F.2d 746 (5th Cir. 1973); Kelite Products, Inc. v. Binzel, 224 F.2d 131 (5th Cir. 1955).
An examination of the testimony taken at trial reveals that Spriggs never proved any actual injury, loss or damage either in the decline in value of the Spriggs property or in lost profits. Lamar Mothershed, President of Mothershed Oil and the Shell distributor who supplied the Spriggs station with all the gasoline it sold, testified on direct as follows:
MR. BALL:
In your opinion what was the value of Lake Forest Shell after the recording of that deed for Gulf?
A. I would say three hundred and twenty-five thousand. *523 However, during crossexamination, Mothershed explained that the decline in property value he earlier testified to was premised on the Gulf station's actually being constructed and not merely on recordation of the deed:
Q. I think you testified that there was a hundred and twenty-five thousand dollars difference in there as a result of this deed being recorded?
A. It would be a hundred and twenty-five thousand dollars, yes, sir.
Q. If a gallon of gas is never pumped from that location then what is the difference, in your opinion?
MR. OWEN:
Which location?
MR. WILKINS:
He knows what I'm talking about.
MR. OWEN:
Well, I don't and I'm entitled to know also Mr. Wilkins.
MR. WILKINS:
If no gas, if this Jury says gas can't be pumped at that location, the Gulf location, then what is your opinion?
A. Well, strictly the sale of gasoline I would go back to the original figure.
Q. Then how much would it be worth?
A. Four fifty.
Q. Now, I think you testified if no gas is pumped from that location then it's worth four hundred and fifty thousand?
A. Right.
Herman Spriggs, who purchased the property from Lake Forest and then built and owned Spriggs Shell station, testified:
MR. OWEN:
If the Court please, we have let him go on a good way that property was worth about five hundred thousand dollars before Gulf got its property.
A. That's my opinion.
Q. It was your opinion that it was worth two hundred and fifty thousand dollars after that?
A. Yes, sir.
Q. The day after Gulf recorded its deed is when you say it was worth two hundred and fifty thousand dollars?
A. This is my opinion.
Q. It's your opinion that the simple recording of the deed made a two hundred and fifty thousand dollar difference in value in your property, is that correct?
A. In my opinion.
Q. All right. When did you develop this opinion with respect to the value? Was this right after the deed was recorded?
A. I have been in the service station business for nine years and in my opinion another service station there would cut my business that much. That is my opinion.
Later, however, Spriggs testified:
Q. ... Now, you have testified here under oath that on the 14th day of January of 1977 that the deed from Lake Forest to Gulf was recorded and it automatically-your Shell Service Station property was reduced by two hundred and fifty thousand dollars, is that your testimony, your opinion?

A. That is my opinion, if they put in another station.

Q. If they put in another station?

A. That is my opinion.

Q. Was that your opinion if they don't put another station in?

A. No, sir.

Q. All right. Now, what, in your opinion, did the value of your property drop when the deed to Exxon was put on record?
A. I couldn't really say because it's across the road from me. I couldn't say.
Q. To make it clear Mr. Spriggs, if Gulf does not put a convenience store or gasoline station of any kind on their property then the value of your property will not be diminished, is that correct?
A. As the business as it is, that is my opinion.
Q. I say that if they don't put it in over there your property will not be reduced in value?
A. If there is not a station go there.
Q. If there is not a station there it will not reduce your value of your property?

*524 A. I don't think so, that is my opinion.
Q. Is your property, that is your Shell Service Station property worth more today than it was in January of 1977?
A. I'm not an expert on real estate but I would say the way things are going that it is. That is my opinion. [Emphasis added.]
With regard to lost profits, which must be capable of ascertainment with reasonable certainty to be recoverable, Malone v. Reynolds, 213 Ala. 681, 105 So. 891 (1925), we note the following testimony from Mothershed:
Q. Have you sold less gas down there at that location since January 1977, less since that date?
A. I don't have any records on it but I wouldn't think so.
Spriggs also testified on lost profits:
Q. Okay. Back on April 18th of 1977 or August 18th of 1977 there was a deposition in this case and your lawyer was present with you, I believe. One of my partners asked you to date. Can you tell me how you have been harmed financially by the transaction in question? Have you lost any profits yet? Can you tell me what your answer would be to that now?
A. To date, I don't know that we have lost any profits.
Q. Can you name any way you have lost business or any costs that you have due to the sale of the property to Lake Forest to Gulf to date?
A. No, sir.
Q. Anything that cost you or your business up to right now?
A. Well, in my opinion, with the exception of what I have had to go through with this case is all. I have had no expenses as far as that.
Mike Carpenter, an employee of the real estate division of Shell Oil Company was questioned about the effect of a competing station in the location in controversy and replied as follows:
Answer: That would definitely. Any location you build there would be easily accessible and would have a tendency to dilute and have some effect. But just to tell you right off what effect is it might not be negligible and it might be severe. It would be really hard without a thorough study. The thing is, I couldn't answer that question. [Emphasis added.]
From the portions of the record I have set out herein, it is evident that Spriggs never proved any actual damage which would in turn have allowed it to recover compensatory damages for fraud, conspiracy, and malicious interference with contractual and business relations.
I now examine the punitive damages awarded. Under Alabama law punitive damages may not be recovered for breach of contract. Geohagan v. General Motors Corp., 291 Ala. 167, 279 So.2d 436 (1973). Thus, any punitive damages must be justifiable under the fraud and conspiracy counts against Lake Forest and Diamondhead and under the malicious interference with business or contractual relations count against Gulf.
An award of punitive damages in an action for fraud will be upheld only if there is evidence from which the jury can conclude that the fraud was malicious, oppressive, or gross, and the representations were made with knowledge of their falsity. [Winn-Dixie Montgomery, Inc. v. Henderson, 353 So.2d 1380, 1383 (Ala. 1977).]
It has also been stated:
The pertinent cases indicate that the primary constituent of gross, malicious, and oppressive fraud is the intention to injure and deceive. [Universal Brokers, Inc. v. Higdon, 56 Ala.App. 184, 320 So.2d 690 (Ala.Civ.App.1975).]
An examination of the evidence shows not that Lake Forest and Diamondhead intended to injure Spriggs but that the intent of both Gulf and Diamondhead was to comply with the terms of the Prince letter of June 21, 1972, even though they had doubts as to its binding effect. The negotiations were conducted with the understanding that Gulf was not being sold the property to build an automotive service station and the deed expressly stated that only a "convenience *525 store with no more than two islands for self-service gasoline pumps" could be placed on the property.
To sustain an award of punitive damages for civil conspiracy, the following standard must be met:
Exemplary or punitive damages [under a conspiracy count] ... may be awarded, if the wrong done is aggravated by evil motive, actual malice, deliberate violence, or oppression, or otherwise essentially sounds in tort....
However, exemplary damages are never recoverable ... if there is no evidence of wantonness or malice. [§ 15A C.J.S. Conspiracy § 33, 718-19 (1967). (Footnotes omitted.)]
As discussed above, the record reflects no evidence of any malice or wantonness on the part of the appellants. Indeed, on my examination of the record it is not certain that Spriggs ever established that there was a conspiracy.
The essence of the allegations that Gulf interfered maliciously with Spriggs' contractual relationship with Diamondhead and Lake Forest and with Spriggs' business would seem to require a standard such as those for punitive damages in fraud and conspiracy claims as the allegations are essentially the same. I note that at all times Gulf acted consistently with the recognition of any possible interests Spriggs might have by virtue of the Prince letter, if it was binding and enforceable. I further find from my perusal of the transcript, evidence indicating that Gulf was involved in the land transaction with Diamondhead to foster its own legitimate business interests. In addition, Gulf constructed no facilities on its property, awaiting a declaratory judgment with respect to Spriggs' rights under the Prince letter.
I have determined from my search of the record that punitive damages were improperly awarded in these cases. As both the compensatory damages and the punitive damages were not correctly determined by the jury, the trial judge should have granted the motion for new trial because the damage award was excessive, indicating bias, passion, prejudice and the like. Mixon v. Traylor, 266 Ala. 486, 97 So.2d 791 (1957).
Two general verdicts were awarded in these cases and thus I cannot determine which of the counts the verdicts were attributable to. As Spriggs failed to prove all the essential elements of some of its claims, a verdict attributable to such claims cannot stand. Shelter Modular Corp. v. Cardinal Enterprises, Inc., 347 So.2d 334 (Ala.1977).
TORBERT, C. J., concurs.
NOTES
[1] "June 20, 1972
"Dixon's Shell Service Station, Inc.
Highway 90
Spanish Fort, Alabama

"This letter will confirm our agreement that Diamondhead Corporation will not sell any of its properties North and between Interchange of I-10 and Dixon's Shell Service Station, Inc. property for the purpose of an automotive service station.
"It is also agreed that any fill dirt that may fall either North or South of Dixon's Shell Service Station, Inc. property that Diamondhead Corporation will hold you Dixon's Shell Service Station, Inc. harmless.
 "Ralph M. Prince"